UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Jason D. Cooper,

                                        Plaintiff,                    **Report and Recommendation**

                v.                                                    12-CV-1227 (WMS)

Superintendent Michael Sheahan *et al.*,

                                        Defendants.

## I.    INTRODUCTION

Plaintiff Jason Cooper ("Cooper") asserts that he was attacked by corrections officers on
October 21, 2012, when the officers mistook him for someone who participated in a prison riot.
For up to eight hours after the riot, the corrections officers allegedly attacked Cooper a second time,
transferred him from one cellblock to another, and failed both to document his whereabouts and to
file certain procedurally required incident reports.  Cooper subsequently commenced this litigation,
alleging various theories of liability by way of 42 U.S.C. § 1983.

Defendants C. Haff, Travis Hill, Michael Maltese, Michael Sheahan, and Shawn VanHorn—
all corrections officers or, in the case of Sheahan, the Superintendent at the prison in question—
now have filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil
Procedure.  (Dkt. No. 93.)  The entire motion rests on arguments about administrative remedies and
scope.  Defendants argue that Cooper never completed the inmate grievance procedure available to
him and thus never exhausted his administrative remedies before commencing federal litigation.
Defendants argue alternatively that, even if Cooper's litigation survived a review of remedy
exhaustion, any claims alleging a failure of a duty to protect him would fail because his original
inmate grievance addressed only claims of excessive force.  Cooper opposes the motion by arguing

that he exhausted administrative remedies when the Superintendent referred his grievance to the Inspector General's Office. Satisfying exhaustion requirements at that point would mean that Cooper's federal litigation was timely. Cooper argues further that he did refer to a failure to protect in his original grievance, thus putting defendants on notice of allegations that would be fleshed out later in his current operative pleading, the second amended complaint.[1]

District Judge William M. Skretny has referred this case to this Court under 28 U.S.C. § 636(b)(1)(A) and (B). (Dkt. No. 22.) The Court has deemed defendants' motion submitted on papers under Rule 78(b). For the reasons below, the Court respectfully recommends denying defendants' motion.

## II.    BACKGROUND

The Court summarized many of the relevant background facts in its prior Decision and Order of November 12, 2018 (Dkt. No. 83) and largely begins with that summary here.

This case concerns accusations of an assault that Cooper suffered at the hands of corrections officers while an inmate at Five Points Correctional Facility ("Five Points" or "5PCF") in Romulus, New York. On October 21, 2012 around 9:00 PM, an inmate riot broke out in the Five Points recreational yard. Cooper was in the yard at the time. Cooper claims to have had no involvement in the riot, but he was misidentified as a participant and assaulted anyway in the recreational yard shortly after corrections officers restored order. Cooper alleges a second assault after he was taken inside and brought to a Five Points intake area:

> Mr. Cooper was then brought to the 5PCF intake area where he was placed in a pen along with other inmates who had been in the gym. Mr. Cooper was then led to the shower area next to the 5PCF intake area. Present there were Defendants

---

[1] The second amended complaint was the first complaint from Cooper prepared by *pro bono* counsel. Cooper prepared his original and first amended complaints himself.

Michael Maltese ("Maltese") and Shawn Vanhorn ("Vanhorn"), both COs, as well as other unidentified John Doe(s) defendants.

Defendant Maltese put a plastic bag over Mr. Cooper's head and Defendants Vanhorn and John Doe(s) turned the shower on and placed Mr. Cooper's head under the shower, or "water boarded" Mr. Cooper. Defendants were questioning Mr. Cooper about the riot. Defendant Maltese repeatedly kicked Mr. Cooper in the groin area.

Defendants Maltese, Vanhorn and John Doe(s) kicked Mr. Cooper in the back of the legs and hit him in the head while questioning him about the riot. Defendants threatened to force Mr. Cooper to drink Gatorade bottles filled with urine. Defendant Maltese told Mr. Cooper that he would kill him if he told anyone about what had happened. Mr. Cooper was then brought back to the pen. Around 3:30am, Mr. Cooper was moved to Block 11 on the orders of an unidentified 5PCF personnel.

Before Defendant Sheahan assumed control of 5PCF, upon information and belief, Defendant Watch Commander and the COs engaged in unruly behavior, such as alleged by Mr. Cooper against Defendant Maltese, Vanhorn and John Doe(s), with all of the inmates brought to the intake area.

Because of the riot, Defendant Sheahan was required to submit an Unusual Incident report to DOCCS [New York State Department of Corrections and Community Supervision]. He essentially submitted verbatim the preliminary Unusual Incident report submitted to him by Correction Officer Sergeant C. Haff ("Haff").

(Dkt. No. 77-1 at 8.) The second amended complaint—the current operative pleading—recites the details above and adds a few other details about the alleged post-riot assault. The shower area in question has no surveillance cameras. (Dkt. No. 84 at 6.) The post-riot assault appears to have occurred after 10:00 PM but no later than 3:30 AM the next morning. (*Id.* at 5–6.) The assault included racial slurs and threats to kill Cooper if he told anyone about what happened. (*Id.* at 8.)

Apart from the assaults themselves, Cooper has drawn attention in his pleadings to how officials at Five Points lost track of him for up to eight hours during the night of October 21–22, 2012. By "losing track," Cooper means that the riot should have prompted a number of procedures and reports including a count of all inmates from his Block 9; paperwork documenting his transfer

from one cellblock to another; the creation of an Unusual Incident Report; and the filing of a Use of Force Report. None of these procedures happened, which would implicate various DOCCS directives and state regulations. As a result, according to Cooper, officials at Five Points have no documentation of Cooper's whereabouts for up to eight hours after the riot in question:

> One very important procedure implemented by DOCCS to meet its constitutional duty of inmate safety is to conduct a "count" of the inmates every hour where every inmate is counted and his presence is accounted for. When the count takes place on the Block, the results are recorded and maintained in a Block log. All inmate movements to and from the Block are recorded in the log as well as all visitors to the Block.

> In addition, upon information and belief, DOCCS has a procedure to take the count of inmates outside of the Block. This way, DOCCS knows where the inmates are at all times.

> Upon information and belief, Defendant Sheahan was notified of the situation when the riot broke out. Defendant Sheahan did not arrive at 5PCF until the early morning hours of October 22, 2018. Defendant Watch Commander, or appropriate DOCCS personnel, was in command of 5PCF until relieved of his command when Defendant Sheahan arrived.

> Defendants Sheahan and Watch Commander failed to ensure that DOCCS procedures for taking the count of inmates take place and that all inmates brought back to Block 9 or to the gym were counted and their presence accounted for.

> After the riot broke out on October 21, 2013, all of the inmates were either brought back to Block 9 or sent to the gym. Defendant Watch Commander was in charge of ensuring all of the inmates were accounted for and safe, whether they were brought back to the Block or the gym.

> Defendants Sheahan or Watch Commander consciously made a decision to override DOCCS procedure and not have the COs conduct a count of Block 9 immediately after the inmates returned there from the yard. Defendants acted with deliberate indifference to the safety of Mr. Cooper.

> However, Mr. Cooper was neither listed on the log for Block 9 as being brought back to the Block that evening nor was he on the Unusual Incident report as being brought to the gym. DOCCS lost track of Mr. Cooper for six to eight hours while in DOCCS custody.

> On the night of the riot, the Block 9 log shows that the Block 9 COs postponed taking the count of the inmates not *once*, not *twice*, but **three** times after

the inmates were brought back inside, a period of several hours.

The decision to postpone the count three times shows the deliberate indifference by Defendant Watch Commander to keep Mr. Cooper safe. Especially during a riot, it is of utmost importance to account for the whereabouts of all of the inmates. DOCCS COs failed to take a count until hours after the inmates were brought back to Block 9.

Defendants Watch Commander and Sheahan intentionally treated Mr. Cooper differently than other Block 9 inmates that evening. It was their responsibility to make sure that all Block 9 inmates were accounted for after order was restored.

However, they failed to ascertain the whereabouts of Mr. Cooper in order to keep him safe during the evening of October 21, 2012 and early morning hours of October 22, 2012.

However, Mr. Cooper was neither listed on the log for Block 9 as being brought back to the Block that evening nor was he on the Unusual Incident report as being brought to the gym.  DOCCS lost track of Mr. Cooper for six to eight hours during a riot.

In addition, the CO prepared a list of Block 9 inmates who were decontaminated because of the chemical bomb used in the yard. Mr. Cooper is not on that list. Finally, the Block 9 log listed all inmates who received medical treatment on the Block at around 10pm. Mr. Cooper is not listed even though there is an Injury Report for Mr. Cooper when he saw the nurse in the infirmary.

Also, Mr. Cooper is not listed on the Unusual Incident report as one of the inmates who was brought to the gym. This report listed all of the inmates brought to the gym immediately after the riot. It then lists whether they were returned to Block 9, were transferred to another Block or transferred to another facility.

Mr. Cooper was not listed on the Unusual Incident report even though he was brought inside to the gym and then was transferred to Block 11 at around 3:30am.

For about six to eight hours, during an emergency situation while 5PCF was in lockdown mode, DOCCS could not officially account for Mr. Cooper's whereabouts due to Defendants Sheahan and Watch Commander's conscious decision to suspend the count three times in a row covering several hours. This deprived Mr. Cooper of his constitutional right to be safe while in custody.

During these six hours that DOCCS lost track of Mr. Cooper, anything could have happened to him. In fact, something did. The incident in the shower with Defendants Maltese and Vanhorn and other unidentified Corrections Officers took place during this time.

Defendants Watch Commander and Sheahan were responsible for following DOCCS procedures to ascertain the whereabouts of all of the inmates during the riot in order to keep them safe. However, they conscious[ly] made a decision to not conduct a count for some irrational and arbitrary reason. As a result, Mr. Cooper suffered injury and could have very easily suffered other horrible injuries at the hands of either COs or other inmates.

(*Id.* at 9–12.)

For reasons that will become apparent below, the timeline of Cooper's attempts at redress is important. As early as October 28, 2012, Cooper wrote to a prison counselor for help coping with physical and emotional injuries that he allegedly suffered during the overnight events of October 21 and 22, 2012. (Dkt. No. 84-1 at 3–4.) On November 5, 2012, Cooper appears to have written a letter to the Inmate Grievance Program ("IGP") regarding the riot, the overnight events, and his injuries. (*Id.* at 5.) The November 5 letter bears Cooper's handwritten notation "Inmate Copy"; the letter bears no stamp from the prison, and whether anyone at the Inmate Grievance Program actually received it is unclear.[2] On November 27, 2012, Cooper filed his formal grievance. (Dkt. No. 93-3 at 28–29.) Consistent with 7 N.Y.C.R.R. § 701.5(a), Cooper submitted his complaint on plain paper in a handwritten letter dated November 25, 2012. In the lower left corner of the letter, the grievance clerk stamped November 27, 2012 as the official date of the grievance; in the upper right corner, the clerk handwrote Cooper's official grievance number: FPT 26837-12. For the sake of brevity, the Court will not reprint the entire letter here; however, because of an argument from defendants about scope that will be addressed later, the Court will highlight and paraphrase the issues that Cooper raised in his grievance:

- Cooper declared that he was "grieving" about being assaulted on October 21, 2012 around 9:30 PM in the main yard and on October 22, 2012 around 3:20 AM in the draft room.

---

[2] The same is true of a second letter that Cooper appears to have sent to the IGP on December 7, 2012. (Dkt. No. 84-1 at 8.)

- Cooper describes being punched and kicked repeatedly in the yard despite complying with all officer directives.

- According to Cooper, officers escorted him to the shower room inside the draft room around 3:20 AM. There, the officers put a plastic bag over his head, choked him, kicked him in the legs, kicked him in the testicles during a strip search, and used racial slurs.

- During the assault in the shower room, according to Cooper, officers also had a sports drink bottle full of a liquid that looked like urine and told Cooper that they were going to make him drink urine.

- Cooper stated that he "wrote a grievance shortly after" the incidents but that it was never answered; Cooper might have been referring to his letters of October 28 and November 5, 2012.

- Cooper stated that he needed mental health assistance to "help me deal with the situation."

- Cooper stated that "I want the C/O's responsible for this to be held responsible[;] they are suppose [sic] to protect our rights [and] not blatantly abuse their position. I fear for my life under their care."

(Dkt. No. 93-3 at 28–29.) On the same day as the stamping and official filing of the grievance, November 27, 2012, the Inmate Grievance Resolution Committee ("IGRC") decided on a course of action for Cooper's grievance called "pass-through." (*Id.* at 25.) The next note in the case history appears to explain what "pass-through" meant here. The IGRC likely sent the grievance directly to the Superintendent, which is the next step in the grievance process. The Superintendent's response of December 5, 2012 stated as follows, reprinted in full (without all-uppercase text):

> In accordance with Directive 4040, 701.8(d)(2), the incident described in this grievance is currently under investigation by the Inspector General's Office. As such, no further investigation or processing of this grievance by Five Points Correctional Facility will occur at this time. **Grievance accepted to this extent.**

(Dkt. No. 84-1 at 1; Dkt. No. 93-3 at 25, 27.) The pass-through decision and the Superintendent's response likely limited Cooper's options within the IGP; the case history ends with a note, dated January 9, 2013, acknowledging Cooper's appeal to the Central Office Review Committee ("CORC") but cutting it off with a note that simply reads, "Exhaust Remedies!" (*Id.*) The note

about exhausting remedies likely meant that Cooper was not allowed to appeal his grievance to the CORC—normally the next step in the grievance process after appealing to the Superintendent (Dkt. No. 93-3 at 12)—until Five Points heard back from the Inspector General's Office. Although the prison never heard back from the Inspector General's Office, CORC issued a determination on May 29, 2013 that affirmed the Superintendent's response and informed Cooper that he "must write the IG [Inspector General] for any information regarding his allegations." (Dkt. No. 93-3 at 23.)

With respect to federal litigation, Cooper submitted his original complaint on November 22, 2012, the date when Cooper declared under penalty of perjury that he was delivering the complaint to the prison mail system. (Dkt. No. 1.) The same day, Cooper submitted a motion for leave to proceed *in forma pauperis* ("IFP"). (Dkt. No. 2.) On December 28, 2012, Judge Skretny issued an IFP screening order. (Dkt. No. 4.) In the order, Judge Skretny noted that Cooper did not include with his application "a certified copy of his inmate trust fund account statement for the six-month period immediately preceding the filing of his complaint." (*Id.* at 1.) On that basis, Cooper's IFP application was denied without prejudice, "and the Clerk of the Court will be ordered to administratively terminate this action, without filing the complaint or assessing a filing fee. Plaintiff will be granted leave to move to re-open within 30 days." (*Id.* at 3.) A footnote to Judge Skretny's conclusion explained what "administrative termination" meant: "Such an administrative termination is not a 'dismissal' for purposes of the statute of limitations, and if the case is reopened pursuant to the terms of this Order, it is not subject to the statute of limitations time bar if it was originally filed timely." (*Id.* (citations omitted).) On January 3, 2013, the Clerk of the Court administratively terminated the case. (Dkt. No. 5.) On February 25, 2013, Cooper filed a revised IFP application. (Dkt. No. 7.) On May 23, 2013, Cooper's IFP application was granted, and a complaint that he had attempted to file under a different case number was accepted in this case as an amended complaint.

(Dkt. No. 9.)  The current operative pleading, the second amended complaint, contains two claims alleging excessive force and five other claims alleging other Eighth Amendment violations.  Given certain arguments from defendants in their pending motion, the following assertions from the second amended complaint have drawn particular attention from the Court:

> One very important procedure implemented by DOCCS to meet its constitutional duty is DOCCS Directive No. 4040 (codified at 7 NYCRR 701.8(d)(2) which requires the Superintendent to determine if there was a bona fide harassment issue in a grievance.  If so, the Superintendent then has to certify or affirm there was a bona fide harassment and then refer the grievance to DOCCS Inspector General's office for investigation.

> Mr. Cooper filed a grievance under the Inmate Grievance Program complaining of the treatment by Defendants Hill, Maltese, VanHorn and John Doe(s) the night of the riot towards him.  Defendant Sheahan affirmed that there was a bona fide harassment issue in Mr. Cooper's case and referred the case to Defendant John Doe, Inspector General.

> To date, the Inspector General has not issued a finding of its investigation nor has the Superintendent issued a decision, in violation of DOCCS Directive No. 4040.  It has been more than *five* years since the Inspector General received the referral from Defendant Sheahan.  Mr. Cooper and his attorney have sent numerous letters to the Inspector General's office requesting an update of the investigation but never received a reply.

(Dkt. No. 84 at 16.)

Defendants filed the pending motion on January 13, 2020.  All of defendants' arguments are variations of the same theme: Cooper failed to exhaust administrative remedies.  Defendants place heavy emphasis on the dates of November 22, 2012, the date when Cooper delivered his original complaint to the prison mailing system; and November 27, 2012, the date when the prison system accepted a formal grievance from him.  (Dkt. No. 93-1 at 7.)  Accepting these two dates as definitive, as defendants urge, would mean that Cooper violated the exhaustion requirement in two ways.  The less favorable way, from Cooper's perspective, would be to view the May 29, 2013 determination from CORC as the exhaustion of administrative remedies and to conclude that

Cooper failed to exhaust by about six months. The more favorable way for Cooper, defendants argue, still would be problematic: Even if the inaction from the Inspector General's Office meant that administrative remedies were either exhausted or rendered impossible to exhaust as of November 27, 2012, Cooper still jumped the gun by five days. Defendants reject the only other path to proper exhaustion for Cooper—accepting October 28 or November 5, 2012 as the start of administrative remedies and then declaring that the remedies were rendered impossible to exhaust— because Cooper has furnished no proof that the prison system ever received any letters predating November 27, 2012. In addition to the problem of chronology, defendants argue that Cooper failed to engage in proper exhaustion because his formal grievance addressed only claims of excessive force—essentially the first two claims in the second amended complaint—and not failure to protect, the substance of the last six claims in the second amended complaint. (*Id.* at 10.) Defendants reject any argument from Cooper about availability of administrative remedies by emphasizing "that the facility had in place a grievance process through which the plaintiff had the right to make and appeal grievances." (*Id.* at 12.)

Cooper opposes defendants' motion in all respects. The core of Cooper's opposition is reliance on different dates to establish exhaustion of administrative remedies. Cooper argues that he received favorable relief on his grievance as of December 5, 2012, when the Superintendent referred the matter to the Inspector General's Office. (Dkt. No. 95 at 8.) The favorable outcome, according to Cooper, is significant because favorable relief on a grievance means that exhaustion has occurred. Cooper's argument about favorable relief sets up the other date on which his opposition depends: April 4 or 18, 2013. Cooper argues that his federal litigation actually began no earlier than April 4, 2013, when he submitted to the prison mail system an amended complaint that temporarily received a different case number when the Clerk of the Court filed it on April 18, 2013. (Dkt. No. 10.) One

10

of the April 2013 dates controls here, according to Cooper, because Judge Skretny explicitly directed

the Clerk of the Court *not* to file the original complaint of November 22, 2012. In the alternative,

even if the Court wanted to look at the original complaint, Cooper urges the Court to use December

11, 2012 as the actual date of commencement. (Dkt. No. 95 at 10.) Cooper argues that the prison-

mailbox rule "is primarily used in habeas petitions" without resolving "when a complaint was filed."

(*Id.*; *but see* Dkt. No. 100 at 5 ("Thus, the record is clear that it was the plaintiff's intention to file an

amended complaint and not initiate a new matter.").) Using the date of December 11, 2012 would

mean that Cooper began federal litigation several days after receiving favorable relief on his

grievance.

Cooper raises other arguments in opposition as well. Cooper argues that failure to exhaust

administrative remedies is an affirmative defense that is waived by failing to raise or to preserve it.

Cooper urges that the Court find waiver now that his case stands seven years from commencement.

With respect to defendants' arguments about the scope of his grievance, Cooper counters that his

"grievance contains enough facts to show how DOCCS officials failed to keep him safe during the

riot on October 21, 2012 by losing custody and control of him and then trying to cover up their

failure afterwards. These facts, plus information and documents within Defendants control, give

Defendants sufficient notice of the failure to keep safe claims." (*Id.* at 12–13.)

## III.    DISCUSSION

### A.  *Summary Judgment Generally*

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material. Only

disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment . . . . More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . . Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "Where, as here, the nonmovant would bear the burden of proof at trial, the movant may show prima facie entitlement to summary judgment by either (1) pointing to evidence that negates its opponent's claims or (2) identifying those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact." *Barlow v. Male Geneva Police Officer who Arrested me on Jan. 2005*, 434 F. App'x 22, 25 (2d Cir. 2011) (summary order) (internal quotation and editorial marks and citation omitted).

### B. Exhaustion of Administrative Remedies

#### i. Exhaustion Generally

"No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which

means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (internal quotation marks and citation omitted). "The first part [of an inquiry into proper exhaustion] involves an assessment whether administrative remedies were in fact available to the plaintiff; the second part instructs courts to consider whether defendants forfeited the affirmative defense of exhaustion by failing to preserve it or should be estopped from raising it because their own actions inhibited the plaintiff's ability to exhaust administrative remedies." *Williams v. Correction Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). The third and final part of the inquiry involves assessing whether remedies were actually available. "Under § 1997e(a), the exhaustion requirement hinges on the 'availability' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1858 (2016) (editorial marks omitted). "[A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. Suppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions. The procedure is not then 'capable of use' for the pertinent purpose . . . . Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* at 1859 (citation omitted). Unavailable remedies include procedural steps that would be considered premature if inmates invoked them before receiving formal responses to preceding steps. *Cf. Carter v. Revine*, No. 3:14-CV-01553 (VLB), 2017 WL 2111594, at *11 (D. Conn. May 15, 2017) (grievance process rendered incapable of use when inmate received no response after transfer); *Holloway v. Corr. Med. Servs.*, No. 4:06CV1235 CDP, 2007

WL 1445701, at *5 (E.D. Mo. May 11, 2007) (administrative remedies sufficiently exhausted when inmate received no response to a request related to medical treatment). Unavailability of administrative remedies can result also from ambiguity about how to navigate parallel processes. *See Carter*, 2017 WL 2111594, at *14 ("The procedural ambiguity Carter faced was exacerbated by the existence of a parallel process for medical staff. In addition to the grievance process, there was also a medical review process, both of which used the same forms.").

        *ii.     When did Cooper's grievance process begin?*

The Court first will resolve the date when Cooper first filed a grievance about the events of October 21–22, 2012. As the Court noted above, the record contains copies of letters that Cooper wrote to a prison counselor or to the IGP on October 28, November 5, and December 7, 2012. The letters are not stamped as received by anyone at Five Points, and whether anyone did receive them would be a question of fact. Nonetheless, state prison regulations set forth that the grievance process begins with a formal complaint, submitted on either a preprinted complaint form or plain paper. *See* 7 N.Y.C.R.R.. § 701.5(a). The three letters do not read like formal complaints. At most, the letters read like Cooper's attempt to resolve his complaints through informal channels. *See id.* § 701.3(a) ("An inmate is encouraged to resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance."); *see also Jenkins v. Raub*, 310 F. Supp. 2d 502, 503 (W.D.N.Y. 2004) (implying that informal letters and filed grievances are separate items); *Houze v. Segarra*, 217 F. Supp. 2d 394, 398 (S.D.N.Y. 2002) ("Although an inmate can certainly choose to resolve matters in other ways, and is encouraged to do so, such an attempt is *not* part of the grievance process.") (citation omitted). As opposed to the letters, Cooper filed a formal grievance on November 27, 2012 that

was received by the grievance clerk and assigned a formal grievance number. The Court thus will

accept November 27, 2012 as the date when Cooper began the grievance process.

iii.    *When did Cooper's grievance process end?*

The Court next needs to determine whether and when Cooper's grievance process came to

an end, for purposes of establishing exhaustion. The undisputed record shows that, on December 5,

2012, the Superintendent requested an investigation by the Inspector General's Office under 7

N.Y.C.R.R. § 701.8(d)(2). (Dkt. No. 93-3 at 27.) A precondition of such a request is that the

Superintendent must determine "that the grievance is a bona fide harassment issue." 7 N.Y.C.R.R.

§ 701.8(d). "[DOCCS] procedures as to an administrative appeal are unclear to this Court where, as

here, the Superintendent has directed that the complaint be investigated by the Inspector General's

Office. At that stage, the inmate has obtained at least partial favorable relief, and as the Second

Circuit has held, where the inmate receives favorable relief there is no basis for administrative

appeal." *Hairston v. LaMarche*, No. 05CIV.6642(KMW)(AJP), 2006 WL 2309592, at *9 (S.D.N.Y.

Aug. 10, 2006) (citing *Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir.2004)). *Cf. Andrews v. Cruz*, No.

04CIV.566PACRLE, 2010 WL 1141182, at *5 (S.D.N.Y. Mar. 24, 2010) ("As Defendants would

have it, despite receiving the transfer he requested in his grievance, and despite learning that the

Investigator General's Office was investigating his grievance, Andrews was required to be a sore

winner and to appeal because he never received a writing from [prison officials] regarding what he

knew to be true about the outcome of his grievance."); *accord Harris v. Gunsett*, No. 12 CIV. 3578

PAC JCF, 2013 WL 3816590, at *8 n.5 (S.D.N.Y. July 22, 2013). The CORC reinforced the idea

that Cooper received at least partial favorable relief through the referral to the Inspector General's

Office. As the Court noted before, when Cooper appealed to CORC on January 9, 2013—perhaps

thinking erroneously that he needed to keep going with the grievance process since he had not heard

any outcome of the referral—CORC made a note that Cooper first had to exhaust remedies. (Dkt. No. 93-3 at 25.) The reference to exhausting remedies almost certainly meant that, in CORC's view, Cooper had to wait for the outcome of the referral before the grievance process could proceed further. That Cooper never heard from the Inspector General's Office, even seven years later, gives the Court one more reason to emphasize the partial favorable relief of December 5, 2012. A certain procedural unfairness would attach to the situation if defendants were allowed to tell Cooper that his grievance was frozen pending the outcome of the referral; that the outcome of the referral never came; and that Cooper nonetheless would be penalized for failing to exhaust administrative remedies that he had no power to advance. Under these circumstances, the Court finds that, for procedural purposes related to defendants' motion, Cooper exhausted his administrative remedies on December 5, 2012.

      *iv.    When did Cooper's litigation begin?*

With start and end dates now determined for Cooper's grievance process, the Court must assess how that process intersected with Cooper's federal litigation. As noted above, the parties cannot agree on when Cooper technically began his litigation: November 22, 2012, when he submitted his original complaint to the prison mail system; December 11, 2012, the date of receipt by the Court and of nominal docketing as Docket No. 1; or April 4 / 18, 2013, the date when Cooper submitted his amended complaint to the prison mail system.

"A civil action is commenced by filing a complaint with the court." Fed. R. Civ. P. 3. Under this District's Local Rules, a *pro se* litigant seeking to commence an action and seeking IFP status is not permitted to file a complaint in the ordinary course. W.D.N.Y. L.R. Civ. P. 5.2(c). Instead, the litigant must submit certain paperwork, together with the complaint, to confirm IFP status. "The case will be given a civil docket number and the *in forma pauperis* motion will be submitted to a

Judge." *Id.* This Local Rule, despite using the word "file" once, implicitly establishes that a potential IFP complaint has only a provisional status until the IFP application is approved. The same practice has been seen in other districts. *See, e.g., Romand v. Zimmerman*, 881 F. Supp. 806, 810 (N.D.N.Y. 1995) ("Under the Local Rules of the Northern District of New York, a determination of whether the applicant will be granted leave to proceed in forma pauperis must be made prior to service of process."). Provisional status addresses the problem that "[a] complaint is not properly filed until after a decision on whether to proceed in forma pauperis has been made." *Id.* at 809 (citations omitted). When courts wrestle with the formal date of filing to address issues related to limitations periods, they resolve the issue at two levels. A *pro se* complaint where IFP status eventually is approved is deemed filed on the date of submission for limitations purposes; it is otherwise deemed filed when IFP status is approved. *See Rosenberg v. Martin*, 478 F.2d 520, 523 n.1a (2d Cir. 1973) ("The complaint was not formally filed by the Clerk of the District Court until May 20, 1968, because filing had to await Judge Mishler's disposition of Rosenberg's motion for leave to proceed *in forma pauperis*, which was received along with the complaint. This motion was granted on May 20, and the complaint filed. Judge Dooling held, however, that 'The action must be treated as commenced on April 15, 1968, when the Clerk of Court received the complaint.' We agree."); *see also Krajci v. Provident Consumer Disc. Co.*, 525 F. Supp. 145, 149 (E.D. Pa. 1981) ("Although a complaint tendered in forma pauperis cannot technically be 'filed' until leave to proceed in forma pauperis has been granted, the limitations period is tolled by the lodging of the complaint.") (citations omitted).

Here, as noted above, Judge Skretny found that Cooper's original submission did not comply with Local Civil Rule 5.2(c) and that Cooper needed to provide sufficient information to allow for a determination of IFP status. Placing Cooper's original submission in provisional status, Judge

Skretny explicitly directed the Clerk of the Court not to "file" the original submission until Cooper either provided more information or paid the filing fee. Judge Skretny then placed a footnote in the order protecting Cooper for limitations purposes by finding that the November 22, 2012 date would apply in the event that any issue arose related to limitations and timeliness. Cooper's IFP status was confirmed on May 23, 2013, and the Clerk of the Court was directed to execute a formal filing of Cooper's amended complaint as the operative pleading. (Dkt. No. 9.) Consequently, and despite docket entries containing events that occurred while the case remained in provisional status, May 23, 2013 is the official date of commencement of this case under Rule 3.

> *v.  What is the scope of Cooper's grievance?*

The Court established above that Cooper exhausted administrative remedies as of December 5, 2012, and that his federal litigation began officially on May 23, 2013. The last question that needs an answer here is what the scope of the litigation should be. As noted above, defendants have argued that Cooper's litigation should be limited to the first two claims of his second amended complaint—the claims pertaining to the alleged assault in the yard on the evening of October 21, 2012—because his grievance did not cover any issues about a duty to protect that appear in the last six claims of the second amended complaint.

"Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002). New York regulations provide a basic, pleading-like standard for the content of grievances, *see* 7 N.Y.C.R.R. § 701.5(a)(2); beyond the basics, "if prison regulations do not prescribe any particular content for inmate grievances, a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. As in a notice pleading system, the grievant

need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004) (internal quotation marks and citation omitted); *accord, e.g., Espinal v. Goord*, 558 F.3d 119, 127 (2d Cir. 2009); *Ocampo v. Fischer*, No. 11-CV-4583 CBA MDG, 2014 WL 7422763, at *3 (E.D.N.Y. Dec. 31, 2014). An offshoot of the grievance pleading requirement, consistent with the overall principle of remedy exhaustion, is that "[t]he PLRA exhaustion requirement prevents a court from considering any claims that a plaintiff did not exhaust through grievance procedures available to him prior to filing suit." *Tolliver v. New York State Dep't of Corr. Servs.*, No. 08 CIV. 4561 (DC), 2009 WL 618371, at *5 (S.D.N.Y. Mar. 12, 2009); *see also Green v. Haimes*, No. 918CV703BKSATB, 2019 WL 2775589, at *6 (N.D.N.Y. May 23, 2019) ("The proper inquiry here, and defendant Haimes's second argument in support of his motion to dismiss, is whether plaintiff communicated the claim which he now presents in federal court in terms that allowed DOCCS to take appropriate responsive measures."), *report and recommendation adopted*, No. 918CV00703BKSATB, 2019 WL 2766544 (N.D.N.Y. July 2, 2019).

Here, the Court sees no discrepancy between the content of Cooper's grievance and the content of the second amended complaint. As the Court summarized and paraphrased above, Cooper used his grievance to raise issues about an assault in the prison yard on the evening of October 21, 2012; a second assault in the overnight hours of October 22, 2012; an alleged use of a plastic bag, intimidation, and racial slurs in connection with the second assault; and a need for mental health support. (Dkt. No. 93-3 at 28.) Cooper explicitly invoked the prison officers' responsibility to protect him and stated that he feared for his life. (*Id.* at 28–29.) The IGP stamped Cooper's letter grievance and accepted it as of November 27, 2012, thus putting the system on notice of Cooper's issues no later than that date. In comparison, the second amended complaint

contains two claims about the two alleged assaults; plus six claims that relate in some fashion to the prison officers' responsibility to protect Cooper and their alleged failure to do so. The only details in the second amended complaint that do not appear in Cooper's grievance concern details that would have been uncovered only through discovery—details such as defective logs and reports that would have allowed prison officers to keep better track of Cooper's whereabouts. These details are only manifestations of the alleged failure to protect that Cooper explicitly mentioned in his grievance. Cooper did enough in his grievance to put the IGP on notice that documentary details probably would be uncovered while investigating whether and how the alleged assaults were allowed to occur. The Court consequently sees no reason to truncate the second amended complaint, as the claims in that pleading correspond to the content of Cooper's grievance.

## IV.    CONCLUSION

By November 27, 2012, Cooper filed a grievance that put defendants on notice that he allegedly was assaulted twice during the evening and overnight hours of October 21–22, 2012. Cooper's grievance put defendants on notice that he considered the assaults a failure of defendants' duty to protect him. By December 5, 2012, Cooper exhausted his administrative remedies when the Superintendent found a bona fide harassment issue and referred the grievance to the Inspector General's Office. Cooper's federal litigation officially came later, when his IFP status was approved and his amended complaint accepted for official filing on May 23, 2013. With a second amended complaint now the operative pleading, Cooper's claims in the pleading correspond to the issues that he raised in his original grievance.

Under these circumstances, and for all the foregoing reasons, the Court sees no defect in Cooper's second amended complaint related to scope or to exhaustion of administrative remedies.

Accordingly, the Court respectfully recommends denying defendants' motion for summary judgment. (Dkt. No. 93.)

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted). "We have adopted the rule that failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object. The rule is enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record. Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review. Such objections would reduce the

21

magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted); *see also Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that of a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round. In addition, it would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate, wait to see which way the wind was blowing, and—having received an unfavorable recommendation—shift gears before the district judge.") (citation omitted).

SO ORDERED.

_/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: April 8, 2020