UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JASON COOPER,

        Plaintiff,

    v.

MICHAEL SHEAHAN, MICHAEL MALTESE,
CHRISTOPHER HAFF, TRAVIS HILL,
SHAWN VANHORN, AND JOHN DOE(S),

        Defendants.

**DECISION AND ORDER**

12-CV-1227S

## I.  INTRODUCTION

In this action, former inmate Jason Cooper seeks damages from corrections officers and the superintendent at a New York state prison for violating his rights under the Eighth Amendment in the aftermath of a prison riot. Before this Court are Defendants' motion for partial summary judgment and Cooper's cross-motion to extend time to substitute a party for a defendant who has died. (Docket Nos. 126, 128.) For the following reasons, this Court will grant Defendants' motion and deny Cooper's motion.

## II.  BACKGROUND

Unless otherwise noted, the following facts are undisputed for purposes of the motion for summary judgment. This Court takes the facts in the light most favorable to Cooper, the non-moving party. See Mitchell v. City of New York, 841 F.3d 72, 75 (2d Cir. 2016) (at summary judgment, a court "views the evidentiary record in the light most favorable to ... the non-moving party").[1]

---

[1] This Court draws these facts from the parties' submissions, including exhibits, for both the instant motion (Docket No. 126) and from a previous motion for summary judgment (Docket No. 93). Where necessary for context, it also draws on the Amended Complaint. (Docket No.  84.)

At all relevant times, Plaintiff Jason Cooper was an inmate in the custody of the New York Department of Correction and Community Supervision ("DOCCS"), housed at Five Points Correctional Facility. (Docket No. 126-3, ¶ 1.) Defendants Michael Sheahan, Michael Maltese, Travis Hill, Shawn VanHorn, and Christopher Haff were all employees of DOCCS at Five Points. (Id., ¶ 3.) Sheahan was the Superintendent of Five Points, and Maltese, Hill, VanHorn, and Haff were all corrections officers ("COs"). (Docket No. 84, ¶¶ 9-11, 14.)

On October 21, 2012, around 9:05 p.m., Cooper was in the yard at Five Points with the other inmates who were housed with him in 9 Block. (Docket No. 96-2 at p. 2.) A riot broke out when COs attempted to break up a fight between several inmates. (Id.) COs in the yard attempted to separate out the inmates who were not involved in the riot. (Id.) Cooper's complaint alleges that he was placed along a fence and handcuffed. (Docket No. 84, ¶ 23.) As Cooper sat, handcuffed, Defendant Travis Hill walked up to him and kicked him on the right side of his face. ("the Yard Incident.") (Id., ¶ 24.)

Eventually, a CO deployed a chemical agent to restore order in the yard. (Docket No. 96-1 at p. 3.) Inmates who were not involved in the riot were returned to 9 Block; they took decontamination showers there around 10:00 p.m. (Docket No. 96 at p. 2.) CO Lindsey prepared a list of inmates who underwent decontamination at this time. (Docket No. 96-2 at pp. 2-4.) Cooper's name does not appear on this list, although it appears that one or more names were cut off at the top of the page. (Id.)  The inmates involved in the riot were sent to the gym, the "draft"—or intake—area, or the Special Housing Unit ("SHU"). (Docket No. 96-1 at pp.3-4.)

Around 10:30 p.m., Cooper was medically examined and treated. (See Docket No.

96-2 at p. 7.) On a form entitled "Part B Physical Examination/Treatment Report," the examiner, whose name is illegible, indicated that Cooper had a ¼ inch laceration to his mid-right eyelid, a 2 cm abrasion, and rib pain. (Id. at p. 6.) Another form, titled "Use of Force Report – Part B – Addendum" contains a number for the "Facility Use of Force Log," and contains the same medical findings with the same illegible signature. (Id. at p. 9.) Finally, the record contains a page titled "Use of Force Report (cont'd)" on which the same examiner made the same medical findings. (Id. at p. 11.) The record does not contain a "Use of Force Report" detailing the use of force by a CO against Cooper.

The record is silent about what happened to Cooper after this medical examination. The next record concerning him is at 3:30 a.m., when the 9 Block log indicates that he was transferred from the draft area to 11 Block. (Docket No. 96-1 at p. 20.) Cooper claims that at some point between his medical visit and his transfer to 11 Block, he was brought to the draft area. (Docket No. 126-2 at p. 54.) He claims that Defendant Maltese took him, handcuffed, into a shower in that area, and that Defendants Maltese and VanHorn assaulted him, put a plastic bag over his head, "waterboarded" him, kicked him in the groin, called him a racial slur, and threatened to make him drink a bottle of what they claimed was urine ("the Shower Incident"). (Docket No. 84, ¶¶ 28-32.)

Cooper claims that the facility lost track of him between his medical visit and his transfer to 11 Block. He claims that, although DOCCS facilities conduct regular counts to ensure that all inmates are accounted for, he was not included in the counts that were conducted that night. (Docket No. 96.) Cooper points to the 9 Block logbook from October 21, 2012, which contains a "late entry" written at the bottom: "the 10pm count, 11pm count and 1:00 am count was delayed due to fight in main (illegible)." (Docket No. 96-1 at p.

3

19.)  This form contains the results of counts of the A1, A2, B1, B2, C1 and C2 areas, and indicates that some inmates from 9 Block were in the "Draft." (Id. at p. 20.) At 3:30 a.m., this record states "movement inmate Cooper C-2-34T 11 A 5405 off count, C-2-36T." (Id.)

Defendants have submitted a "Watch Commander Log" for the night of October 21, 2012. (Docket No. 126-2 at pp. 195-98.) That document indicates that counts were made at 10:00 p.m., 11:00 p.m., 3:00 a.m., and 5:00 a.m. (Docket No. 126-2 at p. 198.) It does not contain an indication that the 9 Block counts were delayed, or any indication that any prisoners were missing from any of the counts.

Five Points Superintendent Michael Sheahan was off duty during the riot. (Docket No. 126-2 at p. 110.) After receiving a call alerting him to the situation, Sheahan immediately drove to Five Points, arriving sometime early on the morning of October 22, 2012. (Id.) Upon arrival, Sheahan went to the watch commander's office located outside the secured area of the facility. (Id.) There, he received reports and assessed the situation. He went into the facility at least one time, checking the regional mental health unit, where some inmates suspected of involvement were being held. (Id. at p. 128.)  He gave no orders until around 5:30 or 6:00 a.m., when he directed that the facility be locked down. (Id. at pp. 125-26.)

There is no indication in the record that Sheahan gave an order to suspend the inmate count during this time. Sheahan testified that, pursuant to DOCCS regulations, the count could be delayed based on conditions in the facility and that no approval was needed for this decision. (Id. at pp. 92-97.) Sheahan was not informed at any point that any inmate was missing from a count. (Id. at p. 168-69.)

Sheahan testified that he did not order the transfer of Cooper from the draft area

4

to 11 Block. (Id. at pp. 138, 154.) He further testified that no particular reason or special paperwork were required for transferring an inmate within the facility. (Id. at p. 85.)

Defendant Christopher Haff was in the yard during the riot, actively involved in subduing inmates and directing where the inmates in the yard should be taken. (Docket No. 129-1 at p. 41-43.) Non-compliant inmates were taken to the gym, the draft, or the SHU. (Docket No. 129-1 at p. 54.) Compliant inmates were taken back to their cells. (Id. at p. 65.)

After the events in the yard, Haff went to the administration building to inform the watch commander about the incident. (Id. at p. 73.) At the request of the watch commander, Haff began preparing an Unusual Incident Report. (Id. at pp. 84-85.) This required Haff to collect all records of the riot, including any "Use of Force Reports" that were created. (Id. at p. 92.)

The Unusual Incident Report in the record, signed by Sheahan and dated November 29, 2012, does not contain any references to Cooper. (Docket No. 96-1 at pp. 2-17.)  It describes the force used to subdue inmates involved in the riot and details injuries and treatments for both inmates and COs after the riot. (Id.)

At his deposition, Haff commented that the medical form for Cooper appeared to be missing certain elements, including "Part A" of the Use of Force form and a description of any medical treatment that was provided to Cooper. (Id. at p. 100.) Haff testified that he always made sure reports he submitted were complete, and that, if he had handled the medical form related to Cooper, he would have sent it back for the missing information to be filled in properly. (Id. at p. 113.) Haff testified that he had never seen Cooper's medical form before. (Id. at p. 112.) There is no evidence in the record that Haff either

5

handled or discarded Part A of the Use of Force form regarding the Yard Incident.

On October 28, 2012, Cooper wrote a letter to a Counselor Palumbo regarding his assaults by Hill, Maltese, and VanHorn. (Docket No. 84-1 at pp. 3-4.) He wrote similar letters to the "inmate grievance program" on November 5 and December 7, 2012. (Id. at pp. 5-10.) He wrote letters to DOCCS Commissioner Brian Fisher and the DOCCS Inspector General dated December 11, 2012, complaining that his grievances had not been addressed. (Id. at pp. 12-14.)

On December 5, 2012, Sheahan responded to Cooper and stated that his grievance was under investigation by the Inspector General's office, and that no further investigation or processing by Five Points would occur. (Id. at p. 1.) On December 19, 2012, the director of the Inmate Grievance Program noted that his complaint had been referred to the Inspector General's Office, informed him that the rules did not provide for complaints to "Central Office," and directed him to bring concerns about the status of his complaint to the "IGP Supervisor." (Id. at p. 2.)

Cooper commenced this action pro se, filing his complaint on December 11, 2012. (Docket No. 1.) On January 2, 2013, this Court terminated his case due to his failure to properly apply for *in forma pauperis* status. (Docket No. 4.) After Cooper moved again, the late Honorable Hugh B. Scott, United States Magistrate Judge, granted his motion to proceed *in forma pauperis*. (Docket No. 9.) Plaintiff filed an amended complaint on May 23, 2013. (Docket No. 10.)

Judge Scott eventually appointed pro bono counsel to represent Cooper. Cooper's new counsel moved to amend Cooper's complaint, and Judge Scott granted this motion

6

over Defendants' opposition.[2] (Docket No. 83.) Cooper filed the operative Amended Complaint on January 8, 2019. (Docket No. 84.)

Defendants moved for summary judgment on January 13, 2020, arguing that Cooper had failed to exhaust his administrative remedies. (Docket No. 93.) This Court adopted Judge Scott's recommendation to deny that motion and the case proceeded to further mediation, further discovery, and the setting of a trial date. (See Docket Nos. 102, 107, 108, 111, 115, 118.) On April 13, 2022, Defendants filed the instant motion for partial summary judgment as to Defendants Maltese, Haff, and Sheahan. (Docket No. 126.) On May 11, 2022, Cooper responded to Defendants' motion and cross-moved for an extension of time in which to move to substitute a party for Maltese, who had died. (Docket Nos. 128, 129.) Defendants replied on May 25, 2022, and this Court took the motions under advisement without oral argument. (Docket No. 131.)

## III.  DISCUSSION

Defendants move for summary judgment on Cooper's claims against Defendants Maltese, Sheahan, and Haff. They argue that because Cooper did not timely move to substitute a party for Maltese after his death, Cooper's claim against Maltese must be dismissed. They also argue that a reasonable jury could not find that either Haff or Sheahan was personally involved in any violation of Cooper's rights.

## A.    Summary Judgment

---

[2] Of relevance to the instant motion, Judge Scott permitted Cooper to add Haff as a defendant, even though Haff had not been served with the original complaint. (Docket No. 83 at p. 11.) Calling it a "tough[] call," Judge Scott found that Haff would be represented by the same counsel as the other defendants, and that there was a chance that Haff was one of the John Doe defendants already named. (Id.) Judge Scott also permitted Cooper to replead his Fourteenth Amendment "failure to protect" claims as Eighth Amendment claims. (Id. at p. 15, "The substance of Counts 3 through 7 will be permitted, but Cooper will have to recast them as Eighth Amendment violations of safety guarantees for inmates.")

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment.  Anderson, 477 U.S. at 252.  A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading....");

D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).  That is, there must be evidence from which the jury could reasonably find for the non-moving party.  See Anderson, 477 U.S. at 252.

In the end, the function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

This Court's Local Rule 56 (a)(1) requires a party seeking summary judgment to submit a short, concise statement, in numbered paragraphs, of the material facts with citations to the record evidence. L. R. Civ. P. 56 (a)(1). The papers opposing summary judgment, in turn, must include a response to each numbered paragraph in correspondingly numbered paragraphs. L. R. Civ. P. 56 (a)(2). "Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." Id.

In support of their motion, Defendants have submitted a Statement of Undisputed Facts with 19 assertions of fact. (Docket No. 126-3.) Cooper, in turn, has submitted an "Additional Statement of Undisputed Facts" that responds to only two points in Defendants' statement, and adds three additional "undisputed" facts. (Docket No. 129-3.)

Defendants ask this Court to deem admitted all the uncontested facts in their Statement of Facts. (Docket No. 131-1 at p. 2.) "[I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court

9

may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion." Giannullo v. City of N.Y., 322 F.3d 139, 143 n.5 (2d Cir. 2003). This Court, therefore, will not simply accept these facts without ensuring that they are supported by evidence in the record.

## B.    Notice of Death and Substitution of Parties

On August 12, 2021, Defendants filed a Suggestion of Death as to Defendant Michael Maltese. (Docket No. 113.) Defendants now ask this Court to dismiss the complaint as to Maltese because Cooper did not timely move to substitute a party for Maltese nor did he request additional time to so move. In response, Cooper asks this Court, belatedly, to grant him additional time to substitute a party for Maltese.

Federal Rule of Civil Procedure Rule 25 (a)(1) provides that if a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed. Fed. R. Civ. P. 25 (a)(1). See also O'Rourke v. Ehsan Food Corp., No. 19-CV-6162 (LJL), 2020 WL 6894663, at *1–2 (S.D.N.Y. Nov. 24, 2020) (citing Harp v. City of New York, No. 01 Civ. 6604(JGK), 2008 WL 2971702, at *2 (S.D.N.Y. July 31, 2008) ("The rule provides that if the motion is not made within 90 days after the notice of suggestion of death is served, the action must be dismissed."); Strope v. Astrue, Civ. No. 08–CV–6136, 2009 WL 1924935 (W.D.N.Y. July 1, 2009) (dismissing an action with prejudice where no motion for substitution was made within Rule 25 (a)(1) period)); Okolie v. Paikoff, 589 F. Supp.

2d 204, 207 n. 2 (E.D.N.Y. 2008) (dismissing claims with prejudice where no motion for substitution was made within the 90–day period prescribed by Rule 25 (a)(1)).

A court may extend the 90-day time period if a motion to enlarge time is filed pursuant to Federal Rule of Civil Procedure 6 (b). See Perry v. Perry, No. 12-CV-5727 NGG MDG, 2014 WL 2993488, at *2 (E.D.N.Y. July 2, 2014) ("If there is an inability or a significant difficulty in identifying the decedent's legal representative or successor, a motion could be brought under Federal Rule of Civil Procedure 6(b) to enlarge the time in which to file the motion for substitution."). "[I]f the court acts, or if a request is made, before the original time or its extension expires," the Court can grant such relief upon a finding of good cause. O'Rourke, 2020 WL 6894663, at *1–2 (citing Fed. R. Civ. P. 6 (b)).

For a motion made after the 90-day period has run, on the other hand, the court may extend the time upon a finding of "excusable neglect." Id. (citing Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1955 (3d ed. 2020) ("[T]he court also may allow substitution on motion made after the expiration of the 90-day period on a showing that the failure to act earlier was the result of excusable neglect, although an extension of time also may be refused if the court finds the reasons for delay to be inexcusable.")).

The determination of "whether neglect of a deadline is excusable ... is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395, 113 S. Ct. 1489, 1498, 123 L. Ed. 2d 74 (1993). The factors a court must consider include the danger of prejudice to the opposing party, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within

11

the reasonable control of the movant, and whether the movant acted in good faith. Id. at 395.

The "history of Rule 25 (a) and Rule 6 (b) makes it clear that the 90 day time period was not intended to act as a bar to otherwise meritorious actions, and extensions of the period may be liberally granted." Freedom Mortg. Corp. v. Williams, No. 19-CV-4123 (ENV), 2022 WL 866854, at *2–3 (E.D.N.Y. Mar. 23, 2022) (quoting Zanowick v. Baxter Healthcare Corp., 850 F.3d 1090, 1094 (9th Cir. 2017)); see also Staggers v. Otto Gerdau Co., 359 F.2d 292, 296 (2d Cir. 1966). At the same time, the party seeking an extension after the 90 days have passed must make some showing of diligence. See Freedom Mortg., 2022 WL 866854, at *2–3 (granting late motion to extend time to identify a successor where plaintiff's counsel contacted defendant's counsel on the same day suggestion of death was filed, searched the internet and LexisNexis to identify decedent's heirs, and retained a company to search surrogate's court records to determine whether a petition had been filed by decedent's son).

Because Cooper did not move to enlarge the time to file a motion for substitution within 90 days of the suggestion of death, this Court must find excusable neglect to grant the relief he seeks. Cooper's counsel asserts that "it has been difficult to identify Defendant Maltese's legal representative or successor." (Docket No. 128-1 at p. 9.) But he does not detail any efforts he has made to find Maltese's possible successor or offer any reasons why it was difficult to identify Maltese's successor. Nor does he offer any reason at all for his delay in seeking an extension of time.

Defendants, for their part, offer documentation that Cooper's counsel read their August 6, 2021 email notification of Maltese's death. (Docket No. 132 at p. 1.) The filing

of the suggestion of death on the docket on August 13, 2021, also provided Cooper's counsel with notice. (Docket No. 113.) Defendants assert, and Cooper's counsel does not contest, that Cooper's counsel never followed up with Defendants' counsel for information regarding a possible successor to Maltese. There does not appear to be any good reason why counsel did not at least move to extend his time to substitute within the 90 days provided by Rule 25 (a).

Cooper has not made any showing of diligence nor does he explain his failure to identify a successor or move for additional time within the requisite 90 days. This Court, therefore, will deny his motion for an extension of time to file a motion to substitute a party for Maltese (Docket No. 128), and Maltese will be terminated as a defendant.

### C.    Claims against Haff

Defendants argue that Cooper's claim against Defendant Christopher Haff must be dismissed because the Amended Complaint does not contain any allegations of Haff's personal behavior and the time for Cooper to amend the complaint to substitute Haff for a John Doe described in Count 4 has passed. They also argue that Cooper's claim against Haff for his role in the "chain of command" must be dismissed because Cooper has failed to establish supervisory liability. Cooper argues that it is appropriate to substitute Haff for the John Doe named in Count 4 of his complaint, and that Haff is liable to him because, by discarding paperwork relating to Cooper, Haff disregarded the risk to Cooper of a subsequent assault by prison staff.

### 1.  Amendment and Relation Back

Cooper's Amended Complaint names Haff as a defendant under "parties," but it does not contain any allegations of any actions he took or failed to take. Count 4 of the

Amended Complaint alleges that John Doe, along with Sheahan and the Watch Commander, deliberately discarded the Use of Force report related to Cooper. (Docket No. 84, ¶ 79.)

Cooper does not actually move this Court for leave to amend his complaint and substitute Haff for this John Doe.  Rather, in response to Defendants' motion for summary judgment as to Haff, Cooper simply asserts: "Defendant Haff should have been named under Count 4 of the Amended Complaint. However, in Count 4, a John Doe is alleged to have discarded Plaintiff Cooper's Use of Force report and failed to include Plaintiff Cooper in the Unusual Incident Report. That John Doe was Defendant Haff." (Docket No. 128-1 at p. 8.)  The question facing this Court, then, is whether it can permit Cooper's claims to proceed against Haff where the operative pleading does not contain any allegations directed at Haff.

Federal Rule of Civil Procedure 15 (a) provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15 (a). The grant or denial of an opportunity to amend is within the discretion of the district court. See Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962). "[U]ndue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ... [or] futility of amendment" are grounds to deny a proposed amendment. Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002) (emphasis added), (quoting Foman, 371 U.S. at 182). An amendment to a pleading is futile where the claim is barred by the applicable statute of limitations period.  Sepulveda v. City of New York, No. 01 CV 3117 (GBD), 2003 WL 22052870, at *2 (S.D.N.Y. Sept. 2, 2003) (citing Grace

14

v. Rosenstock, 228 F.3d 40, 53 (2d Cir. 2000)).

Federal Rule 15 (c) supplies the federal law for relation back of amendments. "Under Rule 15 (c)(3), an amendment to a pleading to change the party against whom a claim is asserted will relate back to the date of the original pleading where … the proposed party 'knew or should have known that, but for a *mistake* concerning the identity of the proper party, the action would have been brought against the party.'" Sepulveda, 2003 WL 22052870, at *2 (quoting Fed. R. Civ. P. 15 (c)(3) (emphasis added)). The Second Circuit has made clear that a failure to substitute a named party for a John Doe defendant is not a "mistake" concerning the identity of the proper party, and therefore it does not relate back to the date of the original complaint. Barrow v. Westhersfield Police Dept., 66 F.3d 466, 469-70 (2d Cir. 1995), modified on other grounds, 74 F.3d 1366 (2d Cir. 1996); see also Lewis v. New York City Police Dept., 99 cv 0952, 2000 LEXIS 69, (S.D.N.Y. Jan. 5, 2000) (citing Barrow and holding that plaintiff's proposed amendments in a Section 1983 case to substitute two named individuals for the John Doe defendants were time barred).

Because naming a John Doe instead of Haff does not constitute the kind of "mistake" for which relief can be granted under Rule 15 (c), Cooper's implied request to amend his complaint and substitute Haff for the John Doe described in Count 4 will be denied.

### 2. A reasonable jury could not find that Haff was personally involved in any violation of Cooper's rights.

Even if relation back were permissible, taking all Cooper's claims in the light most favorable to him, a reasonable jury could not find that Haff violated his Eighth Amendment rights. Count 4 of the Amended Complaint states:

As an initial matter, Cooper alleges in Count 4 that he was injured "when Defendants consciously and deliberately discarded a DOCCS record and denied Cooper the protection afforded him under DOCCS Directive No. 4944." (Docket No. 84, ¶ 84.) But a violation of DOCCS procedures is not, per se, a constitutional violation. Ben-Reuben v. Westchester Cnty., No. 17-CV-9156 (KMK), 2019 WL 1406868, at *4 (S.D.N.Y. Mar. 28, 2019). See also Walker v. City of New York, No. 17-CV-9414, 2019 WL 568392, at *16 (S.D.N.Y. Feb. 12, 2019) ("[T]he failure to follow a DOC[C]S Directive or prison regulation does not give rise to a federal constitutional claim." (citation and alteration omitted); Jones v. Ng, No. 14-CV-1350, 2015 WL 998467, at *7 n.14 (S.D.N.Y. Mar. 5, 2015) (finding that although the plaintiff correctly argued that correction officers failed to follow internal policies and procedures, the failure to follow departmental policy "does not necessarily violate an individual's constitutional rights" (collecting cases)); Rivera v. Wohlrab, 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002) ("Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a DOC[C]S Directive or prison regulation does not give rise to a federal constitutional claim." (citation omitted))

Cooper's claim against Haff, generously construed, appears to be that by discarding the Use of Force form related to the Yard Incident, Haff failed to prevent the harm to Cooper from the Shower Incident. In other words, Cooper's claim is for Haff's failure to protect him.

"To state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with 'deliberate indifference.'" Tangreti v. Bachmann,

983 F.3d 609, 618–19 (2d Cir. 2020) (quoting Vega v. Artus, 963 F.3d 259, 273 (2d Cir. 2020) (quoting Farmer v. Brennan, 511 U.S. 825, 830–31, 114 S. Ct. 1970, 1975, 128 L. Ed. 2d 811 (1994))). Deliberate indifference under the Eighth Amendment standard means the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. (quoting Farmer, 511 U.S. at 837.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). Until recently, a plaintiff could establish the personal involvement of a supervisory defendant by showing that: (1) the defendant participated directly in the alleged constitutional violation[;] (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;] (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;] (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).[3]

But, in Tangreti, the Second Circuit closed off these theories and held that a plaintiff must prove that "that each Government-official defendant, through the *official's own*

---

[3] Defendants brief the issue of personal involvement, appearing to understand Cooper's claim against Haff as one for supervisory liability.  Regardless, after Tangreti, the relevant question is whether a jury could find that Haff himself had the requisite state of mind to support a failure to protect claim.

*individual actions*, has violated the Constitution." 983 F.3d at 619 (quoting Iqbal, 556 U.S. at 676) (emphasis added). To succeed on his failure-to-protect claim against Haff after Tangreti, therefore, Cooper must bring forth evidence from which a reasonable jury could find that Haff *himself* had the requisite state of mind for a failure to protect claim: i.e. that he knew of and disregarded an excessive risk to Cooper's safety.

Here, Cooper claims that Haff discarded the use-of-force form that was created after Cooper was injured in the yard. Cooper's theory appears to be that if Haff had not discarded this form, Cooper would not have been assaulted in the shower by Maltese and VanHorn. The form, in other words, would have alerted Sheahan or other prison staff to a risk that Cooper would be assaulted again.

But even assessing the record in the light most favorable to Cooper, a reasonable jury could not find Haff liable for failing to protect Cooper. First, Cooper has not brought forth any evidence—as opposed to speculation—that Haff ever handled, let alone discarded, the form in question. Further, Cooper has not brought forth evidence suggesting that he faced an excessive risk. As to the risk that that Maltese and VanHorn might assault him, Cooper testified that he had had no contact with them previously and he does not bring forth any evidence suggesting that these two officers were known to have violent tendencies or disciplinary issues. (Docket No. 131 at pp. 6-9.) See Ramsay-Nobles v. Keyser, No. 16 CIV. 5778 (CM), 2019 WL 4383187, at *15–16 (S.D.N.Y. Aug. 21, 2019) (denying defendant supervisor's motion for summary judgment where officer who assaulted plaintiff had twelve uses of force reported against mentally ill inmates, Albany administrators had raised the issue with defendant supervisor several times, including shortly before the incident in question, six inmate grievances alleging excessive

18

force had been filed against officer, and defendant supervisor was at the facility during four of these incidents.) Nor does Cooper anywhere allege that Haff was aware of such a risk to him.

In lieu of showing that Maltese and VanHorn posed a threat to him, Cooper might be able to proceed on a theory that there was a "generalized threat" from the post-riot conditions in the prison. A prisoner can succeed on a failure-to-protect claim where he can show that "a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk." Farmer, 511 U.S. at 842; Villar v. Cnty. of Erie, No. 13-CV-467S, 2020 WL 33125, at *5 (W.D.N.Y. Jan. 2, 2020) (denying motion to dismiss where plaintiff was sexually assaulted by dangerous prisoner, and sheriff knew of DOJ report detailing sexual assaults on prisoners that stemmed from failure to keep prisoners with different criminal histories apart from each other); Warren v. Goord, 476 F. Supp. 2d 407, 412–13 (S.D.N.Y. 2007) (denying motion to dismiss where plaintiff alleged that the slashing attack on him was similar to numerous prior slashing and stabbing attacks in the yard, and that defendants were aware of the slashing attacks and failed to take remedial steps such as installing metal detectors). Cooper presents no evidence either of such a threat or of Haff's knowledge of such a threat.

Of course, a riot is an unusually dangerous event. But merely stating that the prison was dangerous in the aftermath of a riot does not suffice to show notice to a particular defendant. Compare Melo v. Combes, No. 97 Civ. 0204(JGK), 1998 WL 67667, at *5 (S.D.N.Y. Feb. 18, 1998) (dismissing a failure-to-protect claim where plaintiff alleged only

that prison officials knew of "issues of prison safety in the most general sense," but noting that awareness of a "specific dangerous condition on defendant's cell block" would satisfy the deliberate indifference standard) with Farmer, 511 U.S. at 830-31 (finding that risk of assault could be predicted from placing transsexual inmate with feminine characteristics in general population despite knowledge that the penitentiary had a violent environment and a history of inmate assaults, and despite knowledge that inmate would be particularly vulnerable to sexual attack).

Finally, Cooper's theory regarding Haff fails for the simple reason that, even if Haff had not "discarded" the form, there is no evidence suggesting that Sheahan would have reviewed the documents Haff was gathering in time to have prevented the Shower Incident. Haff testified that he received all the documentation he needed within 24 hours, and he submitted the report with accompanying paperwork to the watch commander before he left on October 22, 2012. (Docket No. 129-1 at pp. 126-134.) Sheahan did not sign off on the entire packet until November 29, 2012. (Docket No. 96-1 at p. 17.) There is no evidence that Sheahan or anyone else could have considered these documents before the Shower Incident, which occurred sometime before 3:30 a.m., such that Haff's failure to include a Use of Force form about Cooper prevented Sheahan from being aware of and preventing the Shower Incident.

Cooper's only possible claim against Haff is for failure to protect. But, in response to Defendants' motion, Cooper has not brought forth evidence from which a reasonable jury could find that he was at excessive risk of harm of being assaulted in the shower or that Haff was both aware of this risk and consciously disregarded it. To survive summary judgment, a plaintiff must do more than cast a "metaphysical doubt" as to the material

facts; he must "offer some hard evidence showing that its version of the events is not wholly fanciful." Matsushita, 475 U.S. at 586. Cooper's metaphysical speculation as to Haff's state of mind and as to the chain of causation leading to the Shower Incident does not constitute evidence from which a reasonable jury could find Haff liable.

**D.    Claims against Sheahan**

As with Haff, Cooper argues that Sheahan is liable to him for failing to protect him. His primary argument is that this Court should follow the law of the case as set out in the Decision and Order of the late Honorable Hugh B. Scott, United States Magistrate Judge, recommending that this Court grant Cooper's motion to amend his complaint. (See Docket No. 83.) But Cooper reads too much into that decision. Judge Scott, faced with Defendants' opposition to Cooper's motion to amend his complaint with the assistance of new pro bono counsel, permitted Cooper to replead his Fourteenth Amendment Substantive Due Process claims—that Sheahan had failed to protect him by losing track of him—as "Eighth Amendment violations of safety guarantees for inmates." (Docket No. 83 at p. 15.) Neither Judge Scott nor this Court ever held that the Amended Complaint actually *did* state an Eighth Amendment failure-to-protect claim. And regardless, such a finding would not govern this Court's assessment of the instant motion for partial summary judgment, for which a different standard applies. There is thus no "law of the case" for this Court to apply to the motion before it now.

**1.    Cooper's claims regarding his transfer to 11 Block and Sheahan's handling of his grievance are not cognizable constitutional claims.**

This Court first addresses Cooper's claims related to his transfer to 11 Block and Sheahan's response to his grievances about his assault—both of which occurred after the Shower Incident.

### a.  Cell block transfer

Insofar as Cooper argues that Sheahan violated his Eighth Amendment rights by transferring him or authorizing his transfer to 11 Block, this argument fails.

Cooper does not allege any harm that befell him *after* his transfer to 11 Block, so it is unclear in what way being transferred could give rise to an Eighth Amendment claim. And factually, there is no evidence in the record from which a jury could conclude that Sheahan played any role in the decision to transfer Cooper to 11 Block on the morning of October 22, 2012. Sheahan, in fact, testified that he did not order the transfer. (Docket No. 126-2 at pp. 138, 154.)

Even if Sheahan did transfer Cooper, Sheahan does not appear to have violated any DOCCS rules by doing so. Sheahan testified that no reason had to be given for moving a prisoner within the facility, and that no particular paperwork was required to do so. (Docket No. 126-2 at pp. 85-86.) Sheahan further testified that he had the authority to move an inmate from one block to another within the facility. (Id. at p. 89.) Cooper brings forth no facts to contradict this testimony. And even if Sheahan did disregard DOCCS regulations in transferring Cooper to 11 Block, as discussed above, a violation of DOCCS procedures is not, per se, a constitutional violation. Walker, 2019 WL 568392, at *16 ("[T]he failure to follow a DOC[C]S Directive or prison regulation does not give rise to a federal constitutional claim.").

Finally, this Court declines to second guess the decision to move Cooper from one place to another within the facility. Sandin v. Conner, 515 U.S. 472, 482–83, 115 S. Ct. 2293, 2299, 132 L. Ed. 2d 418 (1995) ("federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.") (citing

Wolff v. McDonnell, 418 U.S. 539, 561, 94 S. Ct. 2963, 2977, 41 L. Ed. 2d 935 (1974)). Cooper's claim that Defendants violated his Eighth Amendment right to be safe when they "denied [him] the protection afforded him under DOCCS procedure regarding inmate transfers between Blocks" fails for all these reasons.  (Docket No. 84, ¶ 91.)

### b.  Grievance processing

Cooper also appears to argue that Sheahan is liable to him for failing to provide a "resolution" to the grievance Cooper filed after he was allegedly assaulted by Hill, Maltese, and VanHorn. (Docket No. 84, ¶¶ 103-05; Docket No. 128-1.) Cooper's claim appears to be that if Sheahan had investigated Cooper's grievance properly, Sheahan would have been able to "remedy" the violation of Cooper's Eighth Amendment rights. (Docket No. 128-1 at p. 7.) But this argument does not fit within the timeline Cooper presents, nor is it a cognizable constitutional claim. Cooper nowhere argues that Sheahan could or should have read his grievance, investigated it, and prevented the Shower Incident, within the post-riot hours of October 22, 2012.  Rather, Cooper appears to be arguing that Sheahan failed to address the grievances Cooper filed after he was assaulted. But the failure to process a grievance *after* an assault, where no further assault occurs, simply does not implicate the Eighth Amendment. "[T]he law is clear that plaintiff has no constitutional right to have his grievances processed at all, or if processed, to have the procedure done properly." Hill v. Napoli, No. 6:09–CV–6546–MAT, 2014 WL 1322476, at *14 (W.D.N.Y. Mar. 31, 2014) (internal quotations and citation omitted). See also Richard v. Fischer, 38 F. Supp. 3d 340, 361 (W.D.N.Y. 2014) ("[I]nmates do not have a constitutional right of access to inmate grievance processes."); Green v. Herbert, 677 F. Supp. 2d 633, 639 (W.D.N.Y. 2010) (inmate's allegation that officer who was assigned to

investigate his grievance conducted a biased, unfair investigation "fails because an inmate has no constitutional right to have his grievances processed or investigated in any particular manner").

Further, "it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." Allah v. Annucci, No. 16-CV-1841 (KMK), 2018 WL 4571679, at *6 (S.D.N.Y. Sept. 24, 2018) (quoting Greenwaldt v. Coughlin, No. 93-CV-6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995)); accord Rivera v. Bloomberg, No. 11-CV-629, 2012 WL 3655830, at *6 (S.D.N.Y. Aug. 27, 2012) ("Even if the [c]omplaints could be read to suggest that [the] [c]ommissioner ... failed to act, a prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official exhibited deliberate indifference by failing to act on information indicating that the violation was occurring.") (alterations and internal quotation marks omitted)); Watson v. McGinnis, 964 F. Supp. 127, 130 (S.D.N.Y. 1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability.") (citations omitted)).

Cooper argues that Sheahan is liable because he failed to "remedy a violation" after learning of it through Cooper's grievance. (Docket No. 128-1 at p. 6.)  Because this implicates a Colon factor, it is no longer a basis for establishing Sheahan's personal involvement. See Tangreti, 983 F.3d at 619. But even under pre-Tangreti precedent, "an alleged constitutional violation complained of in a grievance must be *ongoing* in order to find personal involvement, such that the supervisory official who reviews the grievance can remedy it directly." Allah, 2018 WL 4571679, at *7 (quoting Burton v. Lynch, 664 F.

Supp. 2d 349, 361–62 (S.D.N.Y. 2009) (alteration and internal quotation marks omitted) (emphasis added)); see also Harnett v. Barr, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) ("If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation.").

Here, the injuries Cooper allegedly suffered resulted from the assaults on the night of October 21-22, 2012. He does not allege any ongoing harm or any threat after that date. Any claims Cooper brings related to Sheahan's failure to "remedy" the violations alleged in his grievances must therefore be dismissed.

### 2. Failure to protect

Regarding any actions Sheahan took or failed to take *before* the Shower Incident, Cooper does not claim that Sheahan participated in the assault or ordered Maltese and VanHorn to assault him. Rather, his theory is that Sheahan failed to protect him from being assaulted by Maltese and VanHorn.

As discussed above, "[t]o state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with 'deliberate indifference.'" Tangreti, 983 F.3d at 618–19 (quoting Vega, 963 F.3d at 273 (quoting Farmer, 511 U.S. at 834)). The official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. (quoting Farmer, 511 U.S. at 837). "[A] plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation," Grullon, 720 F.3d at 138, that is, "that each

Government-official defendant, through the *official's own individual actions*, has violated the Constitution." Tangreti, 983 F.3d at 619 (quoting Iqbal, 556 U.S. at 676).

Cooper argues that Sheahan was grossly negligent in supervising Maltese and VanHorn and failed to remedy a violation after learning of it through Cooper's grievance. (Docket No. 128-1 at p. 6.) As discussed above, these theories are no longer available. To succeed in a failure-to-protect claim against Sheahan after Tangreti, Cooper must bring forth evidence from which a reasonable jury could find that Sheahan *himself* had the requisite state of mind for a failure to protect claim: i.e. that he knew of and disregarded an excessive risk to Cooper's safety.

Cooper also argues that Sheahan himself delayed the prisoner count and that Sheahan knew of and failed to remedy the failure to count (Docket No. 128-1 at p. 7). Cooper argues that, if the count had been timely conducted, prison officials would have been aware that Cooper was unaccounted for and Cooper would not have been assaulted in the shower.

This argument fails for two reasons. First, Cooper has failed to raise an issue of fact regarding the adequacy of the count at the facility. The record contains the 9 Block and Watch Commander Logs for the night of October 21-22, 2012. (See Docket No. 96-1 at p. 19; Docket No. 126-2 at pp. 195-98.) Every entry contains a count of inmates. Although Cooper points out that the 9 Block log contains a handwritten note titled "late entry" indicating that the 10 p.m., 11 p.m., and 1 a.m. counts were delayed, this does not necessarily mean that no count was conducted or that the count that was done was somehow improper or incorrect. The document Cooper has produced indicates that counts were performed, albeit late, and next to each time is a list of numbers from each

area in 9 Block and indicates that some inmates were in the draft area. Cooper does not bring forth any evidence from which a jury could conclude that these numbers are either incorrect or falsified.

But even if there were a question of fact regarding Sheahan's role in the count or regarding the count's accuracy, there is no evidence from which a jury could find that Sheahan knew of and disregarded an excessive risk to Cooper's safety when he delayed the count. As discussed above, Cooper testified that he had never had any encounters with Maltese or VanHorn before October 21, 2012. (Docket No. 131 at pp. 6-9.) Further, Cooper brings forth no evidence to suggest that Sheahan was on notice as to Maltese and VanHorn's possible propensity to violence, or of any threat they may have posed to Cooper on the night of October 21-22, 2012. As discussed above, Cooper's theory of a generalized risk of violence after a riot is insufficient without some evidence of warning of the specific risks Cooper faced.

Further, given Cooper's argument that Haff discarded the use-of-force form related to the Yard Incident and that there is no such form in the record, there is no evidence from which a jury could find that Sheahan was on notice that Cooper had been attacked in the yard earlier in the evening. Nor would knowledge that Cooper had been attacked by one CO in the yard necessarily lead to knowledge that Cooper was at risk of another attack, by different CO's, in a decontamination shower hours later.

The question here is whether Sheahan, a supervisor, should be held liable for failing to prevent the harm that allegedly befell Cooper in the shower. Cooper does not argue that Sheahan himself took part in any assault. Sheahan arrived at the facility in the early hours of October 22, 2012, and spent the early hours of the morning receiving

reports of the post-riot status of the prison. Cooper presents no evidence that Sheahan delayed any inmate counts, or that the counts that were conducted were improper. Nor does the record contain any evidence from which a reasonable jury could conclude that Sheahan knew of and disregarded an excessive risk of harm to Cooper. For all these reasons, Cooper's claim against Sheahan must be dismissed.

## IV. CONCLUSION

Because Plaintiff failed to move to substitute a party for Maltese within 90 days of the filing of the suggestion of Maltese's death, and because this Court does not find excusable neglect, this Court will dismiss Cooper's claim as to Maltese. Because there is no evidence from which a reasonable jury could conclude that either Haff or Sheahan failed to protect Cooper in violation of the Eighth Amendment, and because Cooper's allegations do not state a claim for any other constitutional violation, this Court will also dismiss Cooper's claims as they relate to Haff and Sheahan.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Partial Summary Judgment (Docket No. 126) is GRANTED.

FURTHER, that Plaintiff's cross-motion for an enlargement of time in which to file a motion for substitution of Defendant Michael Maltese (Docket No. 128) is DENIED.

FURTHER, that the Clerk of Court is DIRECTED to terminate Defendants Michael Maltese, Michael Sheahan, and Christopher Haff.

FURTHER, that the parties are DIRECTED to re-engage in mediation by August 31, 2022.

28

FURTHER, that the parties are DIRECTED to appear at a status conference before this Court on September 7, 2022, at 9:00 a.m. for a status update and for the setting of a new trial date, if needed.

SO ORDERED.

Dated:      July 27, 2022
            Buffalo, New York


                                        s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge